All right, welcome to Day 3 of the West Courtroom. We've got a usual variety of cases. The criminal case up first. I see you all have apportioned your time. We always just hope you sort of get in what you want to get in, in these little nuggets, in these little nuggets, but we'll see how it goes. All right, first case, United States v. Velasquez et al. Mr. Ebaugh, you're first up. May it please the Court. As explained in Mr. Rodriguez's opening brief, there's a 37-minute proceeding that is not in the record. Initially in the opening brief, Mr. Rodriguez argued that it was a substantial and significant portion of the record that was missing. The government challenged that, and in the reply brief, Mr. Rodriguez pointed out that actually there should be a two-step process whenever you have an omission in the record. The first step is there should be a remand to at least attempt to reconstruct that record. Now, there's persuasive authority, not authority from the circuit, but persuasive authority. Okay, back up a step. So when was this gap in the record first noted? The gap in the record was first noted in Mr. Raul Rodriguez's opening brief for this court. Okay, well, just strikes me a little unusual. We get here to the Court of Appeals, and you're bringing an issue about, is it the matter of the transcript, the transcription, or something that's not in there? Your Honor, this is an unusual case because the defendants have had to file several motions to attempt to try to get a complete record in this case, and when we last received an order from this court, this court ordered that anything that could possibly be transcribed, that it be transcribed, and we have not received a transcript of this 37-minute hearing where Sanchez was severed from this case. Okay, so what relief did you, I know it's up on appeal, but what relief did you see, you know, down below with the court reporter or otherwise? Your Honor, no relief. Does everybody agree it's missing, or is it a contested issue of whether there's something missing? Well, it appears from reading the actual transcript, the court reporter made a note that there was a conference, a judicial proceeding had to determine whether Sanchez should be severed or not. All right, well, are you going to use all your time on that issue? I'm not sure. There's another issue that I'd like to address on behalf of Mr. Rodriguez, and that is the sentence. Well, in one sentence, what's the relief you want? I mean, what do you want us to do about this gap in the record and so forth? Send the whole thing back down? Make a limited remand to reconstruct the record, and then after that, this court can determine whether there's a substantial, significant omission from the record. And if it can be reconstructed, then this court can do an effective appellate review of what happened during those 37 minutes. Because I don't know if there's an error there, because I was not trial counsel, but there could be an error. I mean, what does the record show that they were talking about before the gap began and after the gap began? Were they talking about a particular defendant, a particular issue, or what? The record, it doesn't identify. The only way I can glean what happened during those 37 minutes is that apparently there was a conflict. We're not even sure what type of conflict, whether it was a conflict with an attorney or not. How many lawyers were there? There were four defense lawyers. And they don't know what happened? Presumably, Mr. Sanchez's attorney does. So if there was a remand... Rodriguez wasn't... his counsel wasn't there? His counsel was not there. It was an unusual proceeding because the only counsel that were allowed to stay in during this hearing were Mr. Sanchez's counsel, the government's counsel, and the court staff. But it's public, so you could ask the four lawyers what happened, right? That is true, Your Honor. Have you asked, has any inquiry been made about what the issues were, what the rumors were? Did you find out there's a legitimate issue? Yes, Your Honor. I did consult with Mr. Reginald Van Wade. He gave me some explanations of what might have occurred. He wasn't there. It's hearsay. I'm more than happy to repeat what Mr. Reginald Van Wade... No, no. Do you really believe there's a significant issue there? I can't say that I know for sure, Your Honor. There's apparently a conflict, and there could have been a conflict which would have required... Well, the trial judge obviously had an issue presented about severance, and there was a determination by the judge to sever, and then the matter moved on, so we know that. Was that a closed courtroom and in-camera proceeding, or what? There's no order, or what? Is your appellate issue relative to the propriety or not of the severance? Is that what you're trying to ultimately get at, or what? I apologize, Your Honor. I just want to make sure . . . We know there was a severance of one of the defendants, right? Right. Okay, so at some point, either the government or somebody presented the issue, or it emerged of a need to sever or not. The court granted a severance of the defendant out, so there was some proceeding in which that occurred. I take it you're telling me there wasn't a sealed, closed courtroom proceeding. Is that correct? Your Honor, they didn't go through the steps necessary, and the judge did not make the findings necessary to close the courtroom. I don't know why that decision was made. There was just simply an order for most of the parties and their attorneys to vacate the courtroom and everybody else, except for Sanchez and his attorney and the government's attorney and the court staff. Okay, well, you've exhausted all your time on . . . I guess that's what you chose to bring to our attention. We'll just have to see and then later hear from the government on it. Thank you, Your Honor. Mr. Van Wade. Your Honor, the issue that I would like to highlight has to do with the final issue that we raised in our brief about the fact that the jury was never specifically found that the Texas syndicate affected interstate commerce. The argument was that the jury did find that individuals, the main defendants, had affected interstate commerce, but not that the enterprise of the Texas syndicate as an organization, in this case, affected interstate commerce and foreign commerce. How was the jury charged on that issue? Or put another way, was there an objection to the manner in which the jury was charged on the interstate commerce connection issue? No, Your Honor. Was there a submitted charge from defense counsel relative to that, such that they were dealing with it, the judge wouldn't give any instruction or ask for it? No, Your Honor. All right. So did the judge use the pattern charges? Yes, Your Honor. I believe that's the case. So you're basically objecting to the judge using the Fifth Circuit pattern charge relative to the interstate commerce element? I wouldn't put it that way, Your Honor. What I would say is that . . . if the judge used the Fifth Circuit pattern, then help me understand. You're saying the facts did not show interstate commerce. Is that what you're saying? I'm not saying that, Your Honor. Okay. Why don't we just let you say what you're saying. Simply what I'm trying to say is that that was what was alleged in the indictment, and that was incumbent upon the government and their burden to prove that. It was not stated in the charge to the jury. I would like to just . . . what I would say along those lines, Your Honor, is basically that case law was cited in the government's brief that if, in fact, it had been an omission, it would have been harmless error. They cited a U.S. Supreme Court case. It was Nieder v. U.S. 527. What is your argument? What is your argument? My argument is that in Nieder, the issue of whether an omitted element of offense was harmless error or not . . . Is that what you're saying? No. No, Your Honor. That's not what I'm saying. Did the jury find that Mr. Calciano, he committed racketeering acts that constituted interference with interstate or foreign commerce? Yes, Your Honor. So racketeering acts sounds like it includes others, not just him, right? That's correct, Your Honor. So why do we have to find that it's the Texas syndicates specifically as opposed to racketeering acts? Because if he had been charged as an individual, I think that argument would have obtained, but my argument is that since he was charged as being a member of a criminal enterprise . . . But which was racketeering? Well, the criminal enterprise is the Texas syndicate, and they were charged under RICO, and so my argument is that it places a different burden there. Do you think they had to use the words Texas syndicate? I think that that was one of the elements that they did have to prove in addition to the other elements that were proven. Okay. All right. Thank you, sir. Thank you, Your Honor. Mr. Dolan. Please report. This case raises the issue of whether the court erred under an abusive discretion standard in failing to grade a sudden absence instruction as to one, as a limiting instruction, and two, in the jury charge. Now I'm going to tie in, Judge Jolly, why it is important that a portion of the record that's missing before that portion of the record is missing. On the fourth day of trial, a co-defendant, George Sanchez, he was severed from trial. Again, we don't know why Sanchez was severed from the appellant, from my client. It's a missing part of the record. This happens after Sanchez's membership in the gang is proven up through photographs and having him disrobed. This happens after a perp, Roy Mata, testifies that Sanchez told Donald Trevino, a drug dealer, that he needed to rob a bank to pay off the debt. Trevino consequently robbed a bank to pay off this debt. This happens after the same perp explains that George Sanchez voted to kill Rogelio Mata in 2002. Rogelio Mata happened to be the perp's cousin. The perp himself, he didn't vote to kill his own cousin. But if he casts this vote of life or death, it shows he's casting other votes of life or death. This same perp also explained that George Sanchez voted to kill James Polanco after Christmas of 2005. This should be reviewed for an abuse of discretion, not plain error, as the government submits. Upon learning of this severance after they had this portion of the trial that's missing, Raul Rodriguez's counsel does request a sudden absence instruction as one, a limiting instruction, and two, for the jury instruction as well. The court grants it to the jury charge. The court committed error by not, one, granting a limiting instruction, or two, including it in the jury charge. First, the limiting instruction. He does request a limiting instruction. Raul Rodriguez's counsel, he asked the court, but will there be an instruction to the jury? The court then says, we'll just do it in the final jury charge. The court knew it was being requested and chose to handle it in its own way. What is the jury supposed to be thinking at this point? You've had George Sanchez who's been here this whole trial. You've heard all of this evidence, and they come out, and all of a sudden George Sanchez is gone. There's only two things at this point that the jury can be thinking. One, some sort of medical emergency occurred to George Sanchez, or two, that he pled guilty. Well, we know it wasn't one. We know it wasn't one because if it is one, you are going to say, look, something medical happened. That didn't happen, so the jury was left with the impression that George Sanchez had pled guilty. And this prejudiced all the other defendants because it would dispel any sort of doubt whatsoever. And we don't know why George Sanchez was severed. That's the missing part of the record. To the jury charge, I know it was done orally. However, courts have held that oral requests are sufficient. Wright and Miller explains that an oral request has been held sufficient if the court is clearly informed of the point involved. To your knowledge, was there an order entered by the trial judge to the court recorder or otherwise that that part of the severance proceeding not be packaged with this? In other words, that it exists somewhere else. Do you know if there was an order or a minute entry made pertaining, or you all just don't know? I don't for sure. I think yes, but I don't know for sure. I can't represent that to you at this point. In United States v. Jones, 403F3817, 403F3817, the Sixth Circuit Court of Appeals said that an oral request could be sufficient as to specificity. The First Circuit in United States v. Strauss, 443F2-986, 443F2-986 held that an oral request to be sufficient. And in United States v. Mallin, 843F2-1096, 843F2-1096, the Eighth Circuit Court of Appeals explained that an oral request could be sufficient. Now, I know that the timing of the request is odd because it didn't happen at the actual jury charge. But Rule 30 expressly provides that, quote, the request must be made at the close of the evidence or at any earlier time that the court reasonably says. And I think the point here is that the court agreed to a specific request, and it granted that request when it explained what the content of the instruction would be. It erred. I admit that the counsels also erred in not renewing the request, but I still think that should be reviewed under an abusive discretion standard. In Beasley 519F2233, this court held that if requested, it would have been an error not to grant that. Even under a plain error, there's prejudice, and any doubt was dispelled. All of this ties into cumulative error as well, which shows prejudice. We weren't given a copy of the record explaining why George Sanchez was severed. All right, just so y'all know, has it been asked? Y'all have asked for it now? I would have to double check on that. I believe we asked for every portion of the record and the court granted it. You now know it's missing. You've briefed that it's missing. Have y'all asked the court reporter to transcribe it, and they've said no? At this point, no, Your Honor. No one's asked the court reporter to transcribe it? As far as I know, no, Judge. And also there's cumulative error with the tattoo. Before you filed your brief, you could ask us to order that part transcribed and defer briefing until you got it. I don't understand why that request wasn't made. It was an oversight, but with the jury trial— People have briefed it. How could it be an oversight? It was something that should have been done, Judge. We would ask that you reverse and remit. Thank you. All right. I'm hesitant to butcher your name. Mr. Stelarczyk? James Stelarczyk. Okay. I didn't really— I didn't want to torture you. Thank you. You're welcome. Good morning, and may it please the court. My name is Shane Stelarczyk, and I represent the appellant George Sanchez. Unless the court directs me otherwise, I'm going to focus on our second issue, which addresses one of the Fifth Amendment concerns in the case. Well, would it prejudice you to shed any light on the missing severance, et cetera? If there's a reason given your posture in the argument, then don't tell us, but you represent the person who was severed. I do represent, but here's the thing. I wasn't the trial attorney. I was appointed on appeal. There was missing portions of my record, and I filed paperwork with the trial court to get it done, and it was completed. All I know is that my defendant was severed. It was basically in the transcript that I saw. It was just like there was a conflict, and he was removed, so that's about all the light I can shed on that, sir. What kind of conflict? It just says conflict in the record, so I really can't—it didn't elaborate on it, and so, again, those parts were missing, so I can't tell you anything more. We'll rely on Mr. Stelmack when the government comes up to clarify sort of what happened here. Certainly. Go ahead. Okay, so the Fifth Amendment issue that I want to focus on is one where the question is, was the integrity of the trial process corrupted when we had a—on cross-examination, an 18-year veteran of the FBI inject into the record, your client can get on the stand and testify. It's our position that that's absolutely corrupted the process. In looking at this, this court has set a two-part test, typically, how you evaluate it. The first is, can the statement even be construed as a statement on the individual's Fifth Amendment right? And I think there can be no doubt in this case. You have a witness saying he can get on the stand and testify. The trial court down below acknowledged that this was—he said this ain't fair. You had the prosecutor conceding down below that that was improper, and you have defense counsel criticizing this statement. Was there a limited instruction given immediately after she made the statement to the—I'm not suggesting that you agree that that's enough. I'm just—when it happened, didn't the trial judge sort of immediately instruct the jury to disregard or whatever, whatever? Yes, sir. That was given, and if you bear with me and let me—because this point goes to the—I'm raising this issue about was the statement even a comment on his right to testify because on page 76 and 77 of the government's brief, it seems to appear that they're retracting from that this is even a statement, and I want to make clear that this was a statement. You have a case, United States, Wharton, that was cited in my brief where it was an ambiguous statement, and the court analyzed whether it can be construed as a statement of his silence or another reason, and the court said in that statement it was ambiguous, let it go. But here there can be no doubt that this was a direct statement. So to your—going back to your issue, there's a test that once you find there's a statement, you look to three things typically to see what was the effect of this on the jury. One of them is the charges or the curative instructions given to the jury. First, we had a statement immediately after. I applaud the judge for doing something, but he said that's stricken. And so this court has said in DeLuna that federal judges are expected to give a balanced and moderate explanation of the inferences to be drawn from a defendant's silence in response to a Fifth Amendment violation to keep with its high degree of responsibility to conduct a fair trial. I think the statement that's stricken doesn't comply with that. In trying to look through— You know, your problem on all of that is when you object to the failure of a witness to testify, the reference by the witness, all the court does in curative is just illustrate it. Not necessarily because there's—here's an interesting fact. Well, I mean, it's kind of a sympathetic question to you. I mean, in the sense that—in the sense that an objection usually just makes it worse because the jury gets the whole— where the—in 2008, George Mason put on by Linda DeMaine where it talks about confronting the human ability for getting admissible evidence. And they analyzed an experiment where they give a test scenario of a case where a murder occurred and a weapon was introduced. In one scenario, they said it was admissible. The other, they gave the minimalist instruction, which is like what happened here, disregard or strike that. And then they did two other instructions where they actually get a little more in-depth explained to the jury that they highlight the evidence and say why it was bad. And the findings in that study show that the minimalist instruction is actually worse because the jury ends up using the evidence anyways. So had they gone into more detail, it actually helps the jury in some context. So it's just— This is a very innocuous comment with all due respect. Sure. I mean we've got cases that say it's not reversible error way, way, way over the line than this. Well, not true. I disagree with that because if you look at the Johnston case, even in Johnston, there was that preliminary disregard statement. But then further in the jury charts, they gave a more elaborate, detailed instruction where it covered, similar to ours, that defendants presumed innocent. No inference may be drawn from his silence, and do not consider evidence that was removed from the record. In Johnston, they said despite that instruction, when there is such a direct statement on the defendant's right to testify or his absolute silence, even instruction in that case is not the be-all, end-all. You've got to look at the three things. You also look at the strength of the evidence against the defendant. In one of the defendants in Johnston, they said it wasn't enough because you looked at—there was a lot of circumstantial evidence. This was over—was the name Buck-Buck or—I forgot what it was. Yes, it was about a Buck-Buck. No, you're not—minor detail. Possibly because one of the RICO charges stemmed off of drug trafficking. That Buck-Buck all related to drug trafficking, so it wasn't necessarily inconsequential. I thought it was the name of a person, whether it was Buck-Buck or some other name. But it was in the line of over the drug. So I don't necessarily think that you look at that context. It's the effect on the jury. When a witness says, get on the stand and testify, the jury is going to perceive that as, well, maybe they should get on and testify. Whether his name was Buck-Buck or Bump-Bump or whatever it was. Or just in general to help clarify because this case boiled down to a lot of credibility issues. And you have the government during its closing argument highlighting the fact that all of its witnesses were truthful. So you've got the jury going back and saying, you know what, the government is saying they're truthful. You know what, I agree. Why didn't he get up there and testify to the contrary? So it's the big picture. You've got to look at all three things in conjunction. And the last—sorry, sir. No, I'm just saying I think we've got your point on that one. You fully responded to Judge Owen's response. I apologize. No, no, no. You were responding to her question, as you should have. You've reserved some rebuttal time. Okay. Well, I thank you for the opportunity to appear before you. Sure. Thank you. Mr. Stelman. I always forget your posture. Did you try it in case you've got it on appeal also? No, Your Honor, I did not. I'm just on appeal. That's what I thought. I'm trying to remember. I may be able to—I do have a part of the transcript that talks about it, and it does not shed much light on the severance issue. The judge just says, other than Mr. Sanchez and Mr. King, who is Mr. Sanchez's attorney, and the attorneys for the government, let's clear out the courtroom, and then my staff, of course, can stay. And then it just says, other matters taken up before the court, defendant George Sanchez and his counsel have been excused. And that's what . . . Is there more to be transcribed? I have no—I do not believe there was one, Your Honor. Also, it's not in the record, but it's my belief that a good part of the proceedings took place in camera. I don't believe that the court reporter was taking that down, but I don't know that specifically. Well, who will know the answers? Who will know the answers? I mean, you represent the government. Your Honor, I can tell you what happened. You're not there, but I'm— Your Honor, I can tell you what happened, but it's not in the record. Well, my preliminary question isn't sort of what happened in the hearing, but it's just an odd posture. We get this case on appeal, and the first thing out of the mouth of the defense counsel is about a missing piece of the record. And that's not ordinarily an appellate issue that we deal with. As Judge Owen said, baffles us why somebody hadn't filed a motion before now asking us to order the court reporter or something, but we find out at the beginning of oral argument that something's missing and all of that, and so does it beget. We do this, and we order it, and then we've got to have a supplemental briefing on it and so forth. I'm really coming on the irregularity of who knows within the purview of the government or somebody what the answer is on the record. My best guess is that it was not transcribed. We're going to have to ask to find out. Okay, but you said you could tell us what happened. What happened? I could tell you what happened. It's outside the record. Okay. Well, that's okay. Tell us. Mr. King was appointed by this district judge to be a special counsel investigating an attorney, and Mr. King, in that investigation of an attorney, a disciplinary matter, had a witness that would give evidence against this attorney in a disciplinary matter. Now, when the trial is going on, it's noticed that this witness is on Rodriguez's witness list, so Mr. King says I would be in a bad position if I had to cross-examine someone who is going to help me in this completely different case, and so that was the reason for the sentence. The request is under Rule 10 for the district court to substantially say that. That would be fine. There's no problem with that. Still, you also could say that the standard is whether a substantial and significant portion of the record is missing. So Sanchez was severed and tried it to the same jury, different jury? Sanchez was severed, and this all occurs on the last day of testimony. There's only 45 more pages of transcript left. And, yes, he's severed, and then he has a separate trial, which I sent forth the facts. And then the interesting—well, maybe it's not interesting. The interesting part is that even though this witness was on Mr. Rodriguez's witness list, they get up. It's time for defense to call witnesses, and he calls no witnesses. So it ends up that the severance really occurred over nothing, over something that didn't happen. And so the next issue, I guess, that I heard, and it's from Mr. Cassiano and his counsel on the interstate converse issue. And the argument is that the jury didn't find that this Texas syndicate affected interstate commerce. Now, the way it's argued in Mr. Cassiano's brief, it's a page and a half, right? The argument's a page and a half. And the way it's argued is that based on the indictment, the jury had to find that the Texas syndicate affected interstate and foreign commerce. And he puts the emphasis on the word and. To the extent he's arguing that, the statute can be plead—conjunctively improved disjunctively. To the extent he's saying there's insufficient evidence, there's testimony that the cocaine came from South America, any amount— there's cases saying any amount of drug trafficking affects interstate commerce. This is from Delgado, the case Delgado. Use of a cell phone affects interstate commerce. So if it's a sufficiency question, there's plenty of evidence. To the extent it's a jury instruction issue, there was no objection to the jury instructions. And so plain error would apply. And then I set forth in the brief that interstate commerce is discussed. It says it's only necessary that the natural consequences of the enterprise's conduct affected commerce in some way. And then the 1962D instruction incorporates the 1962C statement, making it a crime for anyone employed or associated with an enterprise engaged in or affecting interstate or foreign commerce. And then the 1962D instructions recounted that each defendant was charged with conspiracy to participate in the affairs of the Texas syndicate. An enterprise allegedly engaged in racketeering activities that affected interstate or foreign commerce. Now, he doesn't argue it this way, but probably the best argument on this issue is that it could have been better enumerated in the charge. But it's under plain error, and the court wasn't alerted that any better enumeration would have been effective. The next issue I heard was from Mr. Velasquez. Gosh, I have like 15 issues, and I don't know which ones they're coming. The instruction for Sanchez's severance. And so the claim is it was error not to instruct on Sanchez's severance. But the first point is there is no request for an instruction. This is exactly what is said after the court says Mr. Sanchez and Mr. King are excused. Rodriguez's counsel says, will there be an instruction given to the jury? And the judge says, I can tell them the case has been severed, but I'm not going to tell them why. I mean, I'm just going to tell them when it comes to the final charge to just consider the defendants before them and not anybody else. And then the judge says, is that what you were asking to counsel? And counsel says, yes. And then the judge says, I will give that charge at the end of the case. And counsel says, yes, Your Honor. There's no objection. And did he give it? The judge did give those instructions at the end, which is essentially the Hansen advice not to be concerned with any other party. The things that she said was the case of each defendant should be considered separately and individually. Finding one or more of the accused guilty should not control any of the other defendants. And then Sanchez's name is redacted from the indictment. And she instructs you may not speculate as to why portions of the indictment were redacted. Essentially, the Hansen advice is given. One of the cases cited is the Barrientos case. And the Barrientos case says it's extremely rare to find plain error regarding failure to instruct. And the Barrientos case is good because it collects cases from all the circuits. Oh, the Doyle, I guess, is the last thing to talk about. Yes, it's unfortunate. I included the full exchange between defense counsel and the agent not as a justification but as an explanation. The cross-examination concerns a recording between Sanchez and Eli Torres. And the translator sets forth they're discussing bug bug. Were you with bug bug? Were you at bug bugs? And the agent in her testimony thought it was bug bug. And the question of whether the reference was to bug bug or bug bug was asked of the agent 11 times. I count, and it's in my briefs, I count 11 times of virtually the same question. And just as the prosecutor is getting up to make an objection, that's when she, the exasperated agent, says, I guess your client can come up here and testify. There's no objection. The court immediately said, uh-uh, Ms. Gutierrez, no, Ms. Gutierrez, that will be stricken. And then counsel goes back to asking the question, could bug bugs be a restaurant? The issue is not brought up until the charge conference, and the court says that she took care of it. And when you're talking about Doyle error, one of the factors is whether it was a spontaneous comment by the witness or a comment prompted by the prosecutor. Well, here it's prompted by defense counsel. It's definitely spontaneous. It's certainly not part of a prosecution plan that after the 11th question that she would say something like that. It happened because the witness was harangued by defense counsel. It's a single reference with the court immediately striking the comment. There is no reference to this in closing argument. The general reference made by the prosecutor was that in the face of cross-examination of all the witnesses, that they didn't retreat from their testimony. The jury was instructed that he presumed innocence. He was not required to produce evidence.  So the court didn't abuse its discretion in denying this trial. Okay, thank you. I don't have anything else. Thank you. Well, let me ask you. I do want to ask you. I mean, they have an audience this morning, but there's a whole ton of briefs related to the tattoos and standing and all that. I mean, it's part of the case, and it is raised. There's no doubt that the photo exhibits were in there, but on top of that, the defendants were made to stand and so on and so forth, and so they argue prejudice beyond that. Sure. So given that the government had already put the photos. Yeah, the tattoo case has two aspects, right? They object on the basis of relevance, so they get abusive discretion. Now, as to their Fifth Amendment claim, there's no objection, and that's under plain air. They talk about parading the witnesses. The jury was out when they took their shirts off, and the jury was out again when they put their shirts back on. The Texas syndicate tattoos are relevant. One of the things we have to show is association, so it's relevant to association at one time. Now, this goes to your question, Chief Judge Stewart. The court found, and this is on 10106 and 10010, that many of the photographs didn't show a face with the tattoo, so you didn't know who the tattoo belonged to, and so that was the reason. What do you mean when you said the jury was out when they took their shirts off and were out when they put their shirts back on? Yes, Your Honor. So they were required to undress. The jury came back in, viewed the tattoos, left, and they put the shirts back on. Exactly. Yes, Your Honor. There would have been ways to tie that. Someone could have brought in and said, I've identified this photograph. This is a photograph of ABCD without making them stand bare-chested or whatever to show their tattoos. Could there be a way of identifying the photographs? Someone could say, go view them off-premises and hold the photo up and say, I've examined the photo and matched it to the defendant, and mark on there, this is Sanchez, this is Rodriguez, this is Velasquez. There are lots of ways to get that in admissible form as opposed to making them stand up in open court and display their tattoos. I don't know why many of those other options weren't looked at. But you can see the drama of it all. Yes, there's drama in it. The judge took as much precautions as she could with the jury being out and the jury being out again as far as the decorum of the situation. Is there any interest in talking about the Fifth Amendment claim? No, as I said, there's just so much devoted to it in the briefing about the tattoos and so forth that didn't come up. But the appeal encompasses everything in the briefs as well. I just wanted to have the government's take on it. But it's helpful that you've bifurcated on the Fifth Amendment aspect of it as well as the others. We'll just have to see. Okay. If you're good, we're good. All right. Thank you, sir. Back to you, Mr. Ebaugh. Your Honors, I did attempt in answer to a previous question, I did attempt to try to get in touch with a court reporter in this case about that 37-minute proceeding. Based on her response, I was led to believe there wasn't a transcript either. I've dealt with this issue in other cases. And when I've tried to do a motion for remand before the case was decided, it was denied. So I took a different tact in this case. But if there wasn't a transcript made, I mean, what do you want us to do? To do a limited remand to reconstruct the record for that 37 minutes, especially since it apparently does concern the client that I'm representing? And how would you ask us specifically? What would you ask us to the district court to do? I would ask the district court to hold a hearing and to have the government's attorney recite what the recollection occurred at the hearing. Have Mr. King, George Sanchez's attorney, recite what he recollects happened at the hearing. Okay. I get it. So what's your best authority for them to call that? I can see in your breathing. They have done record reconstruction remands in Selva, in Pace. They apparently also did it in an unreported decision from this case in Rivera. And then there's persuasive authority from the 11th Circuit where they did it in Presadio, Cordobas. Is there any requirement that there be some level of suspicion or that it really would be relevant? I mean, given what the government's lawyer said here, the reason for the severance, that doesn't sound like that gives you any kind of argument at all. I understand, Your Honor. And it takes to say, well, we're just going to do it because it's missing? Yes, Your Honor, especially when you have new counsel on appeal like I am in this case. I mean, I apologize. I acknowledge. I mean, it's not privilege. You can ask all the lawyers present what happened and if you think something is relevant. I mean, do the cases require you to make some sort of threshold showing or do you just say, I get it as a matter of course, no matter what? Based on my review of these cases, you get it no matter what. Well, even in your cite in your brief to Selva, you know, it just says, when a defendant is represented on appeal to the same attorney defendant in the trial, the court may properly require counsel to articulate a prejudice that may have resulted. And that part of it goes to a lawyer who is present at the trial. It still seems that you've got to make some kind of showing, as opposed to it really being a discovery request. You know, I want to see it, you know, X, but tying it to something besides, I need to see it, it may have something . . . The suspicion that I had while representing Rodriguez is that it might be a situation, like in the Calabrese case that I submitted to this court in the 28J letter earlier this week. Well, you heard the government's representation. Right. I guess you have any reason or not to, you know, that the basis of it wasn't this purported conflict with somebody about something, you know, this disciplinary matter and so on and so forth. So assuming that that's what is shown, I mean, where does that put you? If you go talk to Mr. King and the government's lawyer that was present and they tell you the same thing, do you still want the transfer? I may well not. I'd have to do some research on it because this is the first time I've learned about it. I haven't been able to fully process it. I just want to give my client due process in that regard. Okay. Thank you, Your Honors. Thank you. Let's see. Mr. Van Wake, you had a rebuttal, I believe. Your Honors, I was asked to be allowed to address the issue of Tattoo under Rule 28I briefly. Since I brought it up, you didn't, but go ahead. Yes, Your Honor. The issue, Your Honor, first of all, the judge, with respect to probative value, we've argued that one of the issues involved with the tattoos, that the probative value was outweighed by the prejudicial effect. It tended to inflame the jury. Part of the argument that we would present is that the judge requests, as a general rule, has a pre-authentication. They requested pre-authentication of all of the exhibits before trial, and it's part of the court's standing order. Didn't some of these defendants have tattoos that were visible, even with their shirts on? I believe so. I believe so, Your Honor. I can't remember. It's been a couple of years. Don't the photos show tattoos up here and around here and so forth? I'm not saying it removes your issue, but tattoos on them were visible sitting there in the courtroom, right? Well, I don't know if they would have been able to. Actually, I don't think the jury would have been able to see the tattoos from the distance that they were at. The photographs would have satisfied the government's needs in that respect. Well, I mean, what is your basis, though, for objecting? Is it because it was just unfair prejudice generally, or did it violate their Fifth Amendment rights against self-incrimination? What is your argument? The argument, Your Honor, is that it does violate the Fifth Amendment rights against self-incrimination. Well, the same thing would occur if they took photographs of them and gave it to the jury, wouldn't it? It's forcing them to testify against themselves. If that's the basis, I mean, it does seem to me untoward, and I'd say not good manners or respect for the individual to make him undressed in front of the courts. But I don't know what constitutional right it violates. It may prejudice the trial in a due process sort of way. Well, I think those two factors, and that's why I would argue the cumulative effect of both the Fifth Amendment violation and the prejudicial effect of having them disrobed in court, the way that it would tend to inflame the jury. Is the tattoo different from a scar or a birthmark or anything else under the Fifth Amendment? The purpose of the tattoo, showing the tattoo, was to identify a physical characteristic. If it was identified as a physical characteristic, that would have been one thing. But I think the argument that we're trying to make is that it was a Fifth Amendment violation because it was being offered to show the content of the tattoo, and that's what makes it testimonial and that's what implicates the Fifth Amendment. All right. Okay. Thank you. Thank you. All right. Mr. Lockwood, your final words? Yes, sir. Not to beat a dead horse on the tattoo evidence issue, but I appreciate you bringing it up. It's always difficult when time is divided like this to address all the issues. But I think it is an important Fifth Amendment issue, even though it's clear it's not objected to in the record. But in my context, if you look at it in the cumulative nature, it's also a problem because there's cases, Hubbell v. United States Supreme Court case, you've got the Second Circuit case Greer, prohibits relying on the content of a tattoo for the content of what was written. Here the content of the tattoo was the tattoos that were shown were concealed, and they were, as a compromise, my client was put between a rock and a hard place. Show them openly or we'll stipulate to a picture. The picture was of a T.S. The T.S. is key to this case because they're trying to link membership to an organized criminal organization. The T.S., there were statements saying if you got the T.S. stamp, you're a member. It was emphasized by counsel in closing argument saying this. They made highlights of the fact that he had these stamps. And so this is just not the ordinary context where it's visible, and that would be not a Fifth Amendment violation because it's open and obvious. But Judge Jolly's point is that you can take a photo and introduce it into evidence, and it's just as testimonial. I don't see that that's a violation of the Fifth Amendment. So you said your client was given the offer. You were asked to stipulate or counsel was asked to stipulate, and instead of saying there was no stipulation, so the only—I mean there were other means of doing it. But in lieu of a stipulation, he said, okay, let's put your client up there. Yeah, he was put on the spot and trying to find a way to not have his client parade around. I still think— But he could have stipulated. Yes, that's a tattoo on my client's shoulder or whatever. Yes, yeah, that could have been a solution, but it wasn't. But that was requested, right? Yes, it was requested under the circumstances. But I guess he was forced between put on the spot, hey, your guy is going to take it up, and he was just trying to come up with an on-the-spot solution to appease the court with showing the tattoos. Okay, you've got a red light. Sorry, sir? You have a red light. Okay. Well, thank you. You have one sentence. Okay, one sentence. No, no, no. Whether you— No, send it over. Okay. Whether you look at the evidence isolated for us on the Fifth Amendment or cumulatively between our two issues, we think that adds to the stink factor on the jury that it had to have some effect ultimately on their arrival to their guilty verdict. All right. Thank you for your time. Appreciate it. All right. All counsel are court-appointed in the court, all of us, not just the panel. Appreciate those of you who participate in our CJA program and take these cases up, particularly where you weren't in the trial court and have to fashion the briefs and the arguments, and we do appreciate your service. Mr. Ebar, I want to say within ten days of the date, if you will do your due diligence relative to this missing piece to determine from inquiries whether that's still a viable issue in terms of requests for us to remand or otherwise, it may be that you're satisfied and we press on with the case. So notify the court by letter whether or not that remains a matter. You're either requesting relief or something, and if so, you need to file a motion into which the government would have the opportunity to respond, and we'll deal with that issue expeditiously so either we've got something else waiting or we press on to decide the case. You with me? With me? All right. Thank you. All right. We'll call the second case up. Gloria Wells.